[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 915 
The appellant, Anthony Lawrence Miles, appeals from his conviction for capital murder, see § 13A-5-40(a)(2), Code ofAlabama 1975. The appellant was sentenced to life imprisonment without the possibility of parole.
The evidence at trial tended to show the following: Jill Louise Johnson was shot and killed during the late evening of November 30, 1994, while performing her duties as assistant manager of a Kentucky Fried Chicken restaurant ("KFC") located in Hueytown. At the time, the appellant was employed as a cook at KFC and was on duty the evening of Johnson's murder.
At about 9:30 p.m. the manager, Amelia Grier, stopped by to ensure that everything was all right. Finding a window open, she crawled through the window to make a point to the employees that all windows needed to be shut and locked. Johnson was in her office waiting for the other employees to finish their shifts so she could complete her paperwork; another employee was washing dishes; and the appellant was hosing down the floor. According to Grier, the appellant was taking more time than necessary to clean the floor and did not appear to be concerned about completing his job. After Grier left, the appellant offered to wash the dishes for the remaining employee, something he had never done before. She accepted the appellant's offer and left. Johnson locked the door behind them, leaving only the appellant and her inside.
When Grier beeped Johnson between 10:30 and 11:00 to get the night's figures, she did not get a response, and telephoned Johnson's mother and her husband. After waiting a short time for a response, she called KFC again, still receiving no answer. When Johnson had still not returned home at 11:00 p.m., her husband drove to KFC. Alarmed when he noticed that his wife's car was still in the parking lot and that the lights in KFC were on, he went across the street and telephoned the police.
When they arrived at KFC, the police found no signs of forced entry but discovered an unlocked employee entrance. When they found Johnson, her head was lying on her desk. She had suffered a gunshot wound to her head and a cigarette was still between her fingers. The police concluded that she had not been moved after she was shot. The cookers had been left on and were just beginning to smoke. The appellant's time card showed that he had clocked out at 10:24 p.m. that night, indicating that he was the last person to leave that night. This was later than he would ordinarily clock out on Wednesdays. KFC's deposit bags containing $1,030.00 were not in the restaurant.
Two days before the murder, Teresa Davis, a co-employee who was helping the appellant close for the night, noticed a gun sticking out of the appellant's pants. The appellant showed her the gun and told her that he had let a cousin borrow his car and that he did not want to leave the gun in the *Page 916 
car. Davis told Grier about the gun after Grier told her that Johnson had been killed.
The appellant had driven his mother's car to work the day of the murder, because his car had been wrecked. The appellant testified that he turned the cookers off before he left that night. According to the appellant, after clocking out he warmed his mother's car up and pulled it up beside the door to the restaurant. He yelled to Johnson to let her know he was leaving and to lock the door behind him. He did not notice whether she locked the door, but he saw her standing at the door watching him as he left. As he pulled his mother's car away he noticed another car pulling up to the door. He testified that it appeared that Johnson knew the driver of the other car, so the situation did not appear to be suspicious.
The next day the police found a $5 bill on the ground where the appellant's mother's car had been parked. The investigation of Johnson's murder had reached a standstill until Rickey Braxton, a cousin of the appellant who had a criminal history and who was being interrogated in another robbery, told Detective James Rice that the appellant had revealed to him that he had shot Johnson and had robbed KFC. Braxton was subsequently fitted with a wire and sent into the appellant's house to get a confession on tape. When he entered the house, Braxton told the appellant that he had just killed someone during a robbery and was seeking advice from the appellant on what to do, because the appellant had apparently succeeded in getting away with the KFC murder. During a second taped conversation between Braxton and the appellant, the appellant confessed to Johnson's murder. Although the tape itself was inaudible, Detective Rice overheard the conversation while it was being tape-recorded. While he was incarcerated in the same cell block as the appellant, Braxton signed a written statement to the effect that his assertion that the appellant had confessed to the KFC murder was not true. Braxton testified that he signed this statement because he was scared about what might happen to a "snitch."
 I.
The appellant contends that the prosecutor acted improperly. First, according to the appellant, the prosecutor improperly referred to the transcript of a tape-recorded conversation between the appellant and prosecution witness Rickey Braxton. The trial court had ruled that this transcript would not be admitted into evidence because the tape was inaudible and the transcript was not accurate. Despite this ruling, the prosecutor mentioned the existence of the transcript while questioning Sergeant James Rice on direct examination:
 "Q [By Prosecutor]: Did you transcribe those tapes after listening to them?
"A: Yes, sir, I did.
 "Q: If I showed them to you would it refresh your recollection, that transcription?
"A: Sure."
Although defense counsel's objection to showing the transcript to Sergeant Rice was sustained, the appellant contends that the mere reference to the excluded transcript required a curative instruction and that the trial court's refusal to give such an instruction was therefore reversible error. According to this argument, the mention of the transcript placed a question in the jurors' minds as to why it was not introduced by the prosecution or the defense, thereby prejudicing the defendant.
The record reflects, however, that the appellant suffered no prejudice from the mere mention of the transcript. None of the contents of the transcript was ever admitted into evidence. Furthermore, even the appellant's trial counsel admitted that either party was free to discuss during closing arguments the reasons the transcript was not admitted. The motion in limine filed by the appellant dealt only with the admission of the transcript into evidence and did not address the mention of the transcript. Therefore, the mere mention of the transcript was not prosecutorial misconduct and did not injuriously affect any of the appellant's substantial rights; thus, the trial judge's refusal to give a curative instruction was not error. Rule 45, Ala.R.App.P. *Page 917 
The appellant also contends that the prosecutor acted improperly by allegedly shifting the burden of proof to the defense when he questioned the appellant about the absence of a witness. During cross-examination, the prosecutor asked the appellant the following questions about the whereabouts of Tyrell Averhart, appellant's friend to whose house he had gone to on the night of the murder after leaving KFC: "And I bet Tyrell is nowhere to be found. Where is Tyrell?" According to the appellant, this questioning improperly shifted the burden of proof to the defense because the witness was equally available to the prosecution. This Court held in Hunt v. State,453 So.2d 1083, 1087 (Ala.Cr.App. 1984), "one party may not comment unfavorably on the other party's failure to produce a witness supposedly favorable to that party if the witness is equally available to both sides."
This issue, however, is not preserved for review because the appellant's motion for a mistrial was untimely. Not only did the appellant's trial counsel fail to object immediately after the prosecutor's question, but he did not make a motion for a mistrial based upon the questioning until the next morning after the appellant's testimony had been completed. This Court held in Powell v. State, 631 So.2d 289, 292-93 n. 2 (Ala.Cr.App. 1993):
 "To be timely a motion for a mistrial must be made 'immediately after the question or questions are asked that are the grounds made the basis of the motion for mistrial.' Ex parte Marek, 556 So.2d 375, 379 (Ala. 1989). The motion is untimely if it is not made until the conclusion of the witness's testimony. Menefee v. State, 592 So.2d 642
(Ala.Cr.App. 1991); Robinson v. State, 584 So.2d 533 (Ala.Cr.App.), cert. quashed, 584 So.2d 542
(Ala. 1991)."
Therefore, the issue whether the prosecution improperly shifted the burden of proof to the defendant by questioning him about the absence of a witness is not preserved for review.
The appellant claims that the prosecutor also attempted to improperly shift the burden of proof during closing argument by asking the jurors if they had heard certain testimony by a certain witness. During his closing argument, the assistant district attorney addressed the appellant's testimony that he was accommodating fellow employee Chris Mayweather by allowing him to leave work early so he could be with his girlfriend, Bridgett Jones, who was also an employee at KFC:
 "[The appellant] was encouraging [Bridgett Jones] to leave. He gets on the stand and when asked about that he says Chris Mayweather and I had a little agreement back there because I know what girls want. And I was going to give Chris the opportunity to get what he wanted from her. I didn't hear Chris say that. Anybody hear Chris say that? No. Was he asked that by Mr. Lipscomb? No."
Appellant's trial counsel did object immediately after this statement; his objection was overruled by the trial judge. However, the prosecutor's statements regarding the lack of testimony from Mayweather were permissible. Rather than shifting the burden of proof, these statements constitute an effort to meet the prosecutor's own burden of proof by commenting on the lack of evidence. It is permissible for the prosecutor to ask the jury to draw inferences from the lack of evidence as well as from the evidence presented. Davis v.State, 290 Ala. 364, 365, 274 So.2d 363 (1973). Chris Mayweather was called by the State as a witness and was cross-examined by the defense. Therefore, the defense was given the opportunity to elicit any testimony to corroborate the appellant's testimony. Although Mayweather recounted the events of the evening of the murder in detail on both direct and cross-examination, he did not mention an agreement with the appellant allowing him to leave early. The prosecutor was justified in commenting about the lack of evidence corroborating the appellant's account that he had an agreement with Mayweather.
Finally, the appellant argues that the prosecutor committed misconduct when he insinuated while questioning Chris Mayweather that defense counsel was unprofessional and in his closing argument called defense counsel's actions "dirty lawyer tricks." During direct examination, the prosecutor *Page 918 
asked Mayweather if he had been to defense counsel's office and spoken with him concerning the case, allegedly implying that defense counsel's conferring with Mayweather before the trial was improper. Defense counsel immediately objected and his objection was sustained by the trial judge. The prosecutor immediately ceased this line of questioning. There was no adverse ruling by the trial court on this issue; therefore, the issue is not preserved for appellate review. Rice v. State,611 So.2d 1161, 1164 (Ala.Cr.App. 1992). Furthermore, because no objection was made to the prosecutor's reference to "dirty lawyer tricks" during closing argument, that issue is likewise not preserved for this Court's review. Id. Defense counsel did renew his motion for a mistrial after the prosecutor concluded his argument, alleging that the prosecutor was improperly trying to shift the burden of proof. However, as discussed above, such a motion is untimely unless it is made immediately after the objectionable statement or question is made. Powell, 631 So.2d at 292-93 n. 2.
 II.
The appellant next contends that the evidence presented by the prosecution at trial was not sufficient to support his conviction of capital murder. When reviewing the sufficiency of the evidence, this Court must view all reasonable inferences in favor of the State. Underwood v. State, 646 So.2d 692, 695
(Ala.Cr.App. 1993). The appellant's sufficiency of the evidence argument focuses largely on the fact that the prosecution had to rely heavily upon the cooperation and testimony of Rickey Braxton, the appellant's cousin who was proven "to be a criminal." The appellant cites Ex parte Frazier, 562 So.2d 560
(Ala. 1989), arguing that Braxton's "perjured testimony" entitles the appellant to a new trial.
It is undisputed that Braxton's testimony, if believed, would have been sufficient by itself to sustain the appellant's conviction. Braxton testified that the appellant confessed to Johnson's murder, explaining to him how he had committed the murder and robbed KFC. Furthermore, Braxton was fitted with a wire and sent to the appellant's house in an effort to get the appellant's confession on tape. Although the tapes were such poor quality that they could not serve as evidence, Detective Rice heard the conversations himself and testified from his memory of those conversations at trial. According to Detective Rice, the appellant again confessed to Johnson's murder.
The appellant asserts that Braxton's testimony concerning the confession amounts to perjury because Braxton had signed a written statement claiming that his story about the appellant's confession was false and that he had made it up only because the police had told him that the appellant had claimed that he had committed the murder. The appellant also called numerous witnesses at trial who testified to Braxton's poor character and his propensity to lie, rob, and kill. According to the appellant, Braxton's admitted "flip-flopping" on the issue of the confession makes his testimony inherently suspect.
The general rule, however, is that the credibility of witnesses is within the purview of the jury. Johnson v. State,555 So.2d 818, 820 (Ala.Cr.App. 1989). Although evidence of prior inconsistent statements and poor character for veracity might tend to lower a witness's credibility before the jury, such evidence does not make such witness's testimony automatically unbelievable. In this case, the jury chose to believe Braxton's testimony at trial rather than his written statement disclaiming his account of the appellant's confession. Such a decision was reasonable and proper, especially because Braxton made his written statement while incarcerated in the same cell block as the appellant and feared that the appellant would consider him a "snitch" if he did not recant.
The appellant cannot overcome the deference that must be paid to the jury unless he can somehow show that Braxton committed perjury at the trial. In Ex parte Frazier, 562 So.2d 560, 569
(Ala. 1989), the Alabama Supreme Court set out the following standard for cases in which the death penalty was not imposed:
 "In order to grant a motion for new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was *Page 919 
false; 2) that there is a significant chance that had the jury heard the truth, it would have rendered a different result; 3) that the evidence tending to prove the witness's perjury has been discovered since the trial; and 4) that that evidence could not have been discovered before or during trial by the exercise of due diligence."
The factors listed above show conclusively that reversing a conviction based upon perjured testimony is for exceptional cases and was not meant to apply to situations such as the one provided here by Braxton's testimony. Evidence concerning the reasons given by the appellant to show Braxton's alleged perjury, i.e., his inconsistent written statement and the testimony regarding his poor character, was available at the time of trial and was presented at trial; it was relied heavily upon by the defense and was considered by the jury in determining the appellant's guilt. Therefore, the evidence at trial was sufficient to support his conviction.
 III.
The appellant contends that the trial court's failure to strike for cause a potential juror who had expressed an opinion in favor of the death penalty constituted reversible error. The failure to strike a potential juror who has expressed the opinion that the death penalty should be imposed automatically upon conviction of a capital offense without consideration of aggravating and mitigating circumstances can constitute reversible error. Bracewell v. State, 506 So.2d 354, 358
(Ala.Cr.App. 1986). Although this veniremember initially expressed the view that she would automatically impose the death penalty, upon further questioning and without any duress, she indicated that she would consider the aggravating and mitigating circumstances. The record does not show that the potential juror was so in favor of the death penalty that she would not weigh the aggravating and mitigating circumstances. Therefore, the failure to strike her was not reversible error.
 IV.
At trial the prosecution introduced into evidence a $5 bill found by the police the day after the murder on the ground next to the car the appellant drove to work the night of the murder. The defense objected to the introduction of this evidence before and during the trial. According to the appellant, the introduction of this evidence was reversible error because the prejudice to the appellant substantially outweighed the probative value.
In support of his argument that the $5 bill should have been excluded, the appellant cites C. Gamble, McElroy's AlabamaEvidence, § 50.01 (5th ed. 1996):
 "When a criminal suspect is apprehended, it quite often happens that such person is in possession of a substantial amount of money. The prosecution will usually desire to introduce into evidence this possession for the purpose of giving rise to an inference that this is the money taken in the course of the charged crime. It generally is held that the fact of a person's possession of money, without some fairly reasonable indication that the money was acquired from a particular source of the now-charged crime is not relevant for the purpose of showing that the accused acquired it from a particular source. The rationale for this is that the inference to be drawn from mere possession is too weak. The line of decisions would appear to continue in force, after adoption of the Alabama Rules of Evidence, since such evidence could be viewed as having no tendency to make it more probable that the accused committed the crime."
However, this passage does not appear to apply directly to the $5 bill in this case. The above passage applies where a defendant is found in "possession" of a "substantial amount of money," indicating that it is improper to infer merely from the fact that a defendant has money that he must have obtained the money as a result of the crime in question. In this case, the probative value of this bill derived neither from its face value nor from the fact that it was in the appellant's possession, but rather from the unusual circumstance that it was lying in the appellant's driveway.
The trial court is vested with broad discretion when determining matters *Page 920 
of relevancy and this Court may not overturn its decision except in cases where there is an abuse of discretion.Primm v. State, 473 So.2d 1149 (Ala.Cr.App. 1985), citing C. Gamble, McElroy's Alabama Evidence, § 21.01(1), § 21.01(2), § 21.01(6) (3d ed. 1977); McLeod v. State, 383 So.2d 207 (1980). According to the liberal standard adopted in Alabama, such an abuse of discretion can occur only when evidence that has no probative value is introduced. McElroy's, § 21.019(1). In this case, the jury could have inferred from the unusual circumstance of money lying in a driveway that the appellant dropped the bill in his haste to hide the money. Because the $5 bill in this case did have some probative value, we are unable to conclude that the trial judge erred in admitting such evidence.
Moreover, any error as to this matter would have been harmless, because it is clear, beyond a reasonable doubt, that this evidence did not affect the verdict, especially in light of the overwhelming evidence of the appellant's guilt. This $5 bill did not or probably did not affect the appellant's substantial rights.
 V.
The appellant contends that the court committed reversible error by allowing the introduction of "repetitive, prejudicial, and gruesome" photographs of the victim. At trial the prosecution introduced numerous photographs showing the head of the victim, her temple wounds, the victim's brain, and the victim's body. The appellant alleges that the purposes of these photographs could have been satisfied through limited photographs or diagrams. According to the appellant, the introduction of these photographs constituted reversible error because, he says, they were prejudicial and did not prove or disprove a disputed material fact.
Although he argues that the photographs did not relate to any material fact, the appellant appears to concede that they did contain some probative value. In his argument that diagrams rather than photographs should have been used, the appellant mentions that the forensics expert used the photographs to testify as to the trajectory of the bullet and the angle at which it entered the victim's brain, as well as the cause of death. This testimony was relevant to the issue where the murderer and victim were standing when the killing occurred. Because one of the major issues in the trial was whether the robbery and murder was committed by an employee or was committed by someone unfamiliar with KFC, the positions of the killer and victim were highly relevant. The fact that these photographs were gruesome and cumulative does not make them inadmissible. Ivery v. State, 686 So.2d 495, 516 (Ala.Cr.App. 1996). This Court stated in Craft v. State, 402 So.2d 1135,1138 (Ala.Cr.App. 1981):
 "Photographic exhibits which tend to prove or disprove a material issue, illustrate or elucidate relevant evidence or to corroborate or disprove other evidence, are properly admissible, even where such exhibits were merely cumulative and demonstrative of undisputed facts. Lewis v. State, Ala.Cr.App., 339 So.2d 1035, cert. denied, Ala., 339 So.2d 1038; Hines v. State, Ala.Cr.App., 365 So.2d 320, Ala., 365 So.2d 322."
Therefore, the trial court did not err by allowing the introduction of the photographs of the victim.
The appellant's conviction for capital murder is due to be affirmed.
AFFIRMED.
All judges concur.